**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **BRANDON CALLIER,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **EP-26-cv-00954-LS** |
| **AMERICAN-AMICABLE LIFE INSURANCE COMPANY OF TEXAS**, a Texas Corporation | § | |
| **Defendant.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Brandon Callier with his First Amended Complaint and will show as follows:

## PARTIES

1. Plaintiff BRANDON CALLIER ("Plaintiff") is a natural person, resident of the Western District of Texas, and was present in El Paso County, Texas, for all texts in this case.

2. Defendant AMERICAN-AMICABLE LIFE INSURANCE COMPANY OF TEXAS ("Defendant") is a corporation organized and existing under the laws of Texas and can be served via its registered agent Chief Financial Officer, 200 E. Gains Street, Tallahassee, Florida 32399.

3. Non-named party JOHN DOE is an unknown marketing company hired and authorized by Defendant to place telemarketing robocalls on its behalf.

4. Non-named party TIMOTHY SHASHKOV ("Shashkov") is a natural person and authorized agent of Defendant.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Count I under 28 U.S.C. § 1331, because the claims arise under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (holding that federal courts have federal question jurisdiction over private actions brought under the TCPA).

6. The Court has pendant jurisdiction over the Texas Business and Commerce Code claims under 28 U.S.C § 1367.

7. This Court has general personal jurisdiction over Defendant because Defendant is a Texas corporation.

8. Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District. Residing in the Western District of Texas, he received a substantial, if not every single, phone call from Defendant, which is the subject matter of this lawsuit.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227

9. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes. 47 U.S.C. § 227(b)(1)(B).

12. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).

14. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15. The FCC recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

16. The FCC requires "prior express consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition,

the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

17. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

18. The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

19. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

20. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

**TEXAS BUSINESS AND COMMERCE CODE CHAPTER 301**

21. A telephone solicitor may not make a consumer telephone call to a consumer unless the telephone solicitor, immediately after making contact with the consumer to whom the call is made, identifies himself or herself by name, the business on whose behalf the telephone solicitor is calling, and the purpose of the call. TBCC § 301.051(b)(1)(A-C).

22. A telephone solicitor may not make a consumer telephone call to a consumer unless the telephone solicitor makes the call after 12 noon or before 9 p.m. on a Sunday or after 9 a.m. and before 9 p.m. on a weekday or a Saturday. TBCC § 301.051(b)(2).

23. A consumer injured by a violation of this chapter may bring an action for recovery of damages. TBCC § 301.104.

24. A consumer injured by a violation of this chapter may bring an action for recovery of damages. The damages awarded may not be less than the amount the consumer paid the person who sold the consumer goods or services through the use of the telephone solicitor, plus reasonable attorney's fees and court costs.

25. Venue for an action brought under this chapter is in the county in which the consumer telephone call was received. TBCC § 301.105(2).

**TEXAS BUSINESS AND COMMERCE CODE CHAPTER 304**

26. "Caller identification service or device" means a service or device designed to provide the user of the service or device with the telephone number of the incoming call. Tex. Bus. Com. Code § .304.002(1).

27. "Telemarketer" means a person who makes or causes to be made a telemarketing call. Tex. Bus. Com. Code § .304.002(8).

28. "Telemarketing call" means an unsolicited telephone call made to solicit a sale of a consumer good or service. Tex. Bus. Com. Code § .304.002(9)(A).

29. For the purposes of this chapter, a person makes a telemarketing call if the person effects a telemarketing call on the person's own behalf or on behalf of another entity. Tex. Bus. Com. Code § 304.003.

30. This chapter shall be liberally construed and applied to promote its underlying purpose to protect person and the public against false, misleading, abusive, or deceptive practices in the telemarketing business. Tex. Bus. Com. Code § 304.005(a).

31. The fact that a claimant has recovered under a private right of action arising from a violation of this chapter more than once may not limit recovery in a future legal proceeding in any manner. Tex. Bus. Com. Code § 304.005(b).

32. In making a telemarketing call, a telemarketer may not block the identity of the telephone number from which the call is made to evade a device to identity a telephone caller. Tex. Bus. Com. Code § 304.151(a).

33. A telemarketer may not cause misleading information to be transmitted to a recipient's caller identification service or device or to otherwise misrepresent the origin of a telemarketing call. In making a telemarketing call, a telemarketer may not block the identity of the telephone number from which the call is made to evade a device to identity a telephone caller. Tex. Bus. Com. Code § 304.151(b)(3).

34. A violation of this chapter is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17. Tex. Bus. Com. Code § 304.2581(a).

35. A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce this chapter. Tex. Bus. Com. Code § 304.2581(b).

36. Except as provided by Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited…cause confusion or misunderstanding as

to the source, sponsorship, approval, or certification of goods or services. Tex. Bus. Com. Code § 17.46(b)(2).

37. Except as provided by Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited…cause confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services. Tex. Bus. Com. Code § 17.46(b)(4).

38. A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish. Tex. Bus. Com. Code § 17.50(a).

39. In a suit filed under this section, each consumer who prevails may obtain the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish. Tex. Bus. Com. Code § 17.50(b)(1).

**TEXAS BUSINESS AND COMMERCE CODE § 305.053**

40. A person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A may bring an action in this state against the person who originates the communication for damages in the amount provided by this section. Tex. Bus. & Com. Code § 305.053(a)(2).

41. A violation of this chapter is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17. Tex. Bus. & Com. Code § 305.054(a).

42. A plaintiff who prevails in an action for damages under this section is entitled to the greater of $500 for each violation or the plaintiff's actual damages. Tex. Bus. & Com. Code § 305.053(b)(1-2).

43. The fact that a claimant has recovered under a private action arising from a violation of this chapter more than once may not limit recovery in a future legal proceeding in any manner. Tex. Bus. & Com. Code § 305.055.

## DEFENDANT'S HISTORY OF TCPA VIOLATIONS

44. Defendant has a long history of engaging in illegal telemarketing and has been subject to numerous Better Business Bureau complaints about its unlawful telemarketing practices.

45. Screenshots of consumer complaints to the Better Business Bureau are provided below.[1]

**Initial Complaint**

**Date:** 11/10/2023

**Type:** Customer Service Issues

**Status:** Answered

I am continually being contacted by off shore call centers trying to sell me insurance from American Amicable. They say the offer insurance from over 40 companies, but this is the only company offered and they start swearing and hang up on my when I question them on it. I've received 10 - 20 calls a day for weeks now. When I ask them to stop calling me they tell me they didn't call me, the call was transferred.

**Initial Complaint**

**Date:** 01/27/2025

**Type:** Sales and Advertising Issues

**Status:** Answered

This company uses overseas call centers who spoof their numbers to continue to call and solicit business on their behalf. No matter how many times you tell them to stop calling, they continue to call over and over. This is harassment and illegal and American Amicable should be held accountable.

[1] https://www.bbb.org/us/tx/waco/profile/life-insurance/american-amicable-life-insurance-company-of-texas-0825-35073/complaints

**Initial Complaint**

**Date:** 02/21/2025

**Type:** Service or Repair Issues

**Status:** Answered

This company uses overseas call centers who spoof phone numbers and solicit business on their behalf. Those call centers steal personal information, birthdate, social security number, bank account information and then pass these calls on to American Amicable to obtain a "legitimate" sale.I am on the do-not-call list, yet I get daily calls from these call centers and have spent the time to talk all the way through this little scam several times, including telling an American Amicable agent about what happened...he hung up on me. I have left a voicemail message on the American Amicable purchasing system, where they record your vocal consent to purchase an insurance policy about how this is a problem. Yet, they are still allowing this to happen. They need to change their company policy to only accept sales leads from registered legitimate call centers.

46. Defendant has failed to take action to curtail its illegal acts despite numerous consumer complaints about Defendant's telemarketing practices.

47. Defendant has also been put on notice about its illegal telemarketing practices via at least seventeen (17) Federal lawsuits alleging facts strikingly similar to those alleged herein by Plaintiff.

48. Taken from Pacer, the following is a non-exhaustive list of Federal TCPA lawsuits filed against Defendant:

TABLE A: Federal Lawsuits Accusing Defendant of Violating the TCPA

| Dated Filed | Case No. | Caption | Prerecorded | Spoofed | False Name |
|---|---|---|---|---|---|
| 14-Jan-21 | 4:21-cv-00346 | Abante Rooter v. AALIC of Tex. | | | |
| 18-Oct-21 | 4:21-cv-03416 | Henderson v AALIC of Tex. | Y | Y | Y |
| 6-Jan- 22 | 3:22-cv-00018-FM | Callier v. AALIC of Tex | Y | Y | Y |
| 26-Jan-22 | 2:22-cv-00333 | Smith v. AALIC of Tex | Y | Y | |
| 22-Jan-24 | 1:24-cv-00065 | Gonzalez v. AALIC of Tex. | Y | Y | Y |
| 5-Feb-24 | 6:24-cv-00243-MC | Griffin v. AALIC of Tex. | | | Y |
| 5-Feb-24 | 3:24-cv-00043-DB | Guadian v. AALIC of Tex. | | | |
| 9-Sep-24 | 5:24-cv-01038-FB-RBF | Ortega v. AALIC of Tex. | Y | Y | Y |
| 18-Oct-24 | 2:24-cv-02930-DMF | Landwer v. AALIC of Tex. | Y | Y | Y |
| 3-Jan-25 | 3:25-cv-00061-MGL | D. Costa v. AALIC of Tex. | | | |

| | | | | | |
|---|---|---|---|---|---|
| 9-Jul-25 | 5:25-cv-00816-FB | Ortega v. AALIC of Tex. | Y | Y | Y |
| 7-Aug-25 | 3:25-cv-01468-JKM | Friel v. AALIC of Tex. | Y | Y | Y |
| 18-Sep-25 | 6:25-cv-00433 | N. Rowan v AALIC of Tex. | Y | | |
| 17-Oct-25 | 6:25-cv-00402-JDL | J. Tatum v. AALIC of Tex. | Y | Y | Y |
| 18-Nov-25 | 6:25-cv-02201-JSS-LHP | S. Sherwood v. AALIC of Tex | Y | Y | Y |
| 25-Feb-26 | 3:26-cv-05187 | R. Higdon v. AALIC of Tex. | Y | Y | Y |
| 19-Mar-26 | 6:26-cv-00176 | G. Caplan v. AALIC of Tex. | Y | Y | |

49. A "Y" in the "Prerecorded column indicates the plaintiff in the case alleged Defendant used a prerecorded voice message as part of its telemarketing.

50. A "Y" in the "Spoofed" column indicates the plaintiff in the case alleged Defendant used spoofed caller identification as part of its telemarketing.

51. A "Y" in the "False Name" column indicates the plaintiff in the case alleged Defendant used a false, incorrect, or misleading name as part of it telemarketing.

**Defendant's Use of Prerecorded Messages**

52. "Plaintiff received multiple calls from a variety of spoofed caller ID's that contained a prerecorded message from 'Kate from Senior Benefits'". *Callier v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 23, No. 3:22-cv-00018-FM (W.D. Tex. Jan. 6, 2022).

53. "Both calls began with a pre-recorded message regarding insurance benefits available." *Smtih v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 30, No. 2:22-cv-00333 (E.D. Penn. Jan. 26, 2022).

54. "The calls were clearly pre-recorded because (a) there was a pause before the recording played, (b) the robot had a generic and unnatural monotone voice, and (c) the identical message was played in each of the 17 calls." *Gonzalez v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 32, No. 1:24-cv-00065 (W.D. Tex Jan. 22, 2024).

55. “All of the calls placed to Plaintiff’s Number utilized an automatic telephone dialing system (ATDS) or pre-recorded voice. This is evidenced by the use of a generic and unnatural monotone voice in numerous calls, the identical message played repeatedly…” *Ortega v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 21, No., 5:24-cv-01038-FB-RBF (W.D. Tex. Sep. 9, 2024).

56. “[C]onsumers who answer calls initiated by the Defendant, US Funeral Expenses…are greeted by automated, prerecorded voice messages…many of the calls are related to the Defendant, American-Amicable Life Insurance Company of Texas Life Insurance products.” *Landwer v. American Amicable Life. Ins. Co. of Tex et al.,* Complaint ¶ 68, No. 2:24-cv-02930-DMF (D. of Arizona Oct. 28. 2024).

57. “The campaign initiates calls to Plaintiff through unidentified third-party vendors utilizing an automatic telephone dialing system (‘ATDS’) and/or an artificial or prerecorded voice. *Ortega v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶ 25, No. 5:25-cv-00816-FB (W.D. Tex. Jul. 9, 2025).

58. “Many of the calls began with a prerecorded message using an avatar voice response. The calls were clearly prerecorded because they all sounded similar to one another. When Plaintiff made a spoke [sic] or asked a question in response to the caller, the recorded caller was often non-responsive.” *Friel v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶¶ 36-38, No. 3:25-cv-01468-JKM (M.D. Penn. Aug. 7, 2025).

59. “Plaintiff Rowan could tell that this agent was automated because the intonation was unnatural, the agent sounded artificial and the pauses were too long and unnatural.” *Rowan v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶ 18, No. 6:25-cv-00433 (W.D. Tex. Sep. 18, 2025).

60. “Plaintiff received at least thirty-four (34) prerecorded voice message calls from Defendant to his personal cell phone soliciting life insurance plans. The calls were robotic in nature and contained a non-human monotone sounding voice.” *Tatum v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶¶ 36-37, No. 6:25-cv-02402-JDL (E.D. Tex. Oct. 17, 2025).

61. “Each call began with a distinct pause and beep, a hallmark of an automatic telephone dialing system (‘ATDS’) or prerecorded call transfer system.” *Sherwood v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 16, No. 6:25-cv-02201-JSS-LHP (M.D. Flo. Nov. 18, 2025).

62. “If the Plaintiff answered the Defendants’ calls, she was greeted by an artificial or prerecorded voice which, after automatically playing its announcement, transferred the call to a live agent who engaged Plaintiff in conversation”. *Higdon v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 27, No. 3:26-cv-05187 (W.D. Wash. Feb. 25, 2026).

63. “Plaintiff said he was recording the call. The caller did not respond to Plaintiff's voice. Rather, the caller continued to speak uninterrupted. Thus, on information and belief, the telephone call in question used a prerecorded or artificial voice.” *Caplan v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 51, No. 6:26-cv-00176 (W.D. Tex. Mar. 29, 2026).

**Defendant’s Use of False Names in Marketing**

64. “The prerecorded message began with ‘Hi, this is Kate from Senior Benefits.’” *Callier v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 25, No. 3:22-cv-00018-FM (W.D. Tex. Jan. 6, 2022).

65. “[W]hen Plaintiff answered the call there was a long pause, followed by a beep, then a representative answered the phone stating he was “John with American Senior Benefits”. *Hendeson v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 31, No. 4:21-cv-03416 (S. D. Tex. Oct. 18, 2022).

66. “[T]he calls all used the same artificial voice message, which stated that it was ‘James’ from ‘Senior Benefits’ calling to sell a life insurance party [sic]”. *Gonzalez v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 31, No. 1:24-cv-00065 (W.D. Tex Jan. 22, 2024).

67. “Defendant and/or Defendant’s agent represented themselves as an entity called ‘Funeral’ Expense.” *Griffin v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶ 25, No. 6:24-cv-00243-MC (D of Oregon. Feb. 5, 2024).

68. “Defendant knowingly uses illegal spoofed caller ID numbers and the illegal fictitious name ‘Senior Benefits’, ‘American Senior Benefits’, and others to hide the fact that it is actually the Defendant calling to sell policies using what it knows are highly illegal prerecorded robocalls.” *Ortega v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 23, No., 5:24-cv-01038-FB-RBF (W.D. Tex. Sep. 9, 2024)

69. “A common patter in these calls involves a prerecorded message from a fictitious persona…in numerous calls, an artificial robotic voice states, “Hello, this is Hannah Walker with US Funeral Expenses.” *Ortega v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶ 26, No. 5:25-cv-00816-FB (W.D. Tex. Jul. 9, 2025).

70. “Each of the phone calls listed herein falsely identified the company making the phone call and failed to properly identify the company.” *Tatum v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶¶ 38, No. 6:25-cv-02402-JDL (E.D. Tex. Oct. 17, 2025.

71. “Calls from spoofed numbers continued with the same pre-recorded questions constantly.” *Tatum v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶¶ 40, No. 6:25-cv-02402-JDL (E.D. Tex. Oct. 17, 2025.

72. “When Plaintiff later attempted to return the phone calls, all numbers were invalid or disconnected, indicating the use of spoofed or temporary numbers to conceal the caller’s

identity." *Sherwood v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶ 23, No. 6:25-cv-02201-JSS-LHP (M.D. Flo. Nov. 18, 2025).

73. "Another set of American Amicable phone agents identified themselves as 'Senior Benefits' and they made many calls to Plaintiff". *Higdon v. American Amicable Life. Ins. Co. of Tex*., Complaint ¶ 65, No. 3:26-cv-05187 (W.D. Wash. Feb. 25, 2026).

**Defendant's Use of Spoofed Phone Numbers in Marketing**

74. "Plaintiff received multiple calls from a variety of spoofed caller ID's." *Callier v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 23, No. 3:22-cv-00018-FM (W.D. Tex. Jan. 6, 2022).

75. "The Callier ID for both calls was 'spoofed' to make it appear that it was coming from a local (267) number." *Smtih v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 28, No. 2:22-cv-00333 (E.D. Penn. Jan. 26, 2022).

76. "This included 17 calls from between June 2, 2023, and June 19, 2023, from various caller identification numbers." *Gonzalez v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 29, No. 1:24-cv-00065 (W.D. Tex Jan. 22, 2024).

77. "The vast majority of the calls came from illegally 'spoofed' caller ID numbers to hide the fact that they were coming from Defendant. When the numbers are called back they are either disconnected or ring to local residents unrelated to the Defendant." *Ortega v. American Amicable Life. Ins. Co. of Tex.,* Complaint ¶ 22, No., 5:24-cv-01038-FB-RBF (W.D. Tex. Sep. 9, 2024).

78. "Defendant's agents, sub-agents and marketers placed an outbound telephone solicitation to Plaintiff whose number is on the National Do Not Call Registry on Wednesday, 23 October 2024 at 8:42 a.m. CST, from a 'Spoofed' number of 312.481-7248." *Landwer v. American*

*Amicable Life. Ins. Co. of Tex et al.,* Complaint ¶ 69, No. 2:24-cv-02930-DMF (D. of Arizona Oct. 28. 2024).

79. “The Defendant, American-Amicable Life Insurance Company of Texas, agents, subagents, or marketers engaged in something referred to in the telemarketing industry as ‘Neighborhood Spoofing.’ Neighborhood spoofing or Neighbor Spoofing is when callers use an electronic device to deliberately transmit a reliable-looking phone number to the recipient’s call ID to disguise the caller’s identity. *Landwer v. American Amicable Life. Ins. Co. of Tex et al.,* Complaint ¶ 83, No. 2:24-cv-02930-DMF (D. of Arizona Oct. 28. 2024).

80. “Defendants employ a strategy of concealing their identities and avoid accountability…The calls regularly originate from illegally ‘spoofed’ Caller ID numbers to obscure their origin.” *Ortega v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 24, No. 5:25-cv-00816-FB (W.D. Tex. Jul. 9, 2025).

81. “Defendant TrustPoint, at Defendant American-Amicables’s direction, placed calls to Plaintiff from ‘spoofed’ telephone numbers.” *Friel v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 33, No. 3:25-cv-01468-JKM (M.D. Penn. Aug. 7, 2025.

82. “American Amicable and its agents always transmitted false caller ID information to each of the solicitation calls they initiated to the Plaintiff. When Plaintiff would call back to the displayed number it would not reach American Amicable or its agents because the transmitted caller ID information was false.” *Higdon v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶¶ 44-45, No. 3:26-cv-05187 (W.D. Wash., Feb. 25, 2026).

83. “The call was ‘spoofed’ to appear as though it originated from phone number (978) 358-2631.” *Caplan v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 48, No. 6:26-cv-00176 (W.D. Tex. Mar. 29, 2026).

84. "Defendant used the telephone number (978) 813-8234 and called Plaintiff's cellular telephone number. This call was also spoofed to appear to come from Plaintiff's local area code." *Caplan v. American Amicable Life. Ins. Co. of Tex.*, Complaint ¶ 54, No. 6:26-cv-00176 (W.D. Tex. Mar. 29, 2026).

**DEFENDANT'S HISTORY WITH PLAINTIFF**

85. On January 6, 2022, Plaintiff sued Defendant in Complaint EP-22-cv-00018-FM for alleged pre-rerecorded phone calls soliciting life insurance. *Callier v. American Amicable Life. Ins. Co. of Tex.*, Complaint ECF. 1, No. 6:26-cv-00176 (W.D. Tex. Jan. 6, 2022).

86. Plaintiff filed a Second Amended Complaint on August 23, 2022. *Id.* ECF. No. 24.

87. On August 23, 2022, Defendant filed a motion to dismiss for failure to state a claim. Among other things, Defendant alleged that it was not vicariously liable for the phone calls made when its licensed insurance agent, Sophia Ahmad, hired a third-party telemarketer to make prerecorded solicitation phone calls. *Id.* ECF No. 26.

88. On October 18, 2022, the Court issued its Order Denying Defendant's Motion to Dismiss. *Callier v. Am.-Amicable Life Ins. Co. of Tex.,* No. EP-22-CV-00018-FM, 2022 U.S. Dist. LEXIS 228176 (W.D. Tex. Oct. 18, 2022).

89. In denying Defendant's motion to dismiss the Court found insurance companies are vicariously liable for the tor acts of their subagents, noting:

> [T]he allegations demonstrate an agency relationship between the telemarketers and Ms. Ahmed given her direct involvement in the call.[2] Second, they show an agency relationship between Ms. Ahmed and Defendant since Ms. Ahmed is a registered insurance agent for Defendant and sells insurance on its behalf. Thus, the telemarketer

[2] *See Callier v. Nat'l United Grp., LLC*, EP-21-CV-71-DB, 2022 WL 4088205, *6 (W.D. Tex. Sept. 6, 2022) (finding an agency relationship may have existed between an unnamed telemarketer and an insurance agent because, although the insurance agent was not present on the call, she had a "high degree of 'relatedness'" to the call as she was the one "responsible for the act of selling insurance policies").

was allegedly Defendant's subagent. Texas courts hold a principal vicariously liable for the tortious acts of its subagents.[3] *Id.*

90. "[E]ven if it had been Ms. Ahmed (who hired the telemarketer), she and Defendant allegedly had a principal-agency relationship, meaning Defendant, the principal, may be liable for her conduct to the extent that she was action as an agent for and on behalf of Defendant." *Id.* referencing *Schrum v. Land,* 12 F. Supp.2d 576, 582 (S.D. Tex. 1997).

91. Plaintiff settled this lawsuit with Defendant on November 30, 2022.

92. Plaintiff alleged allegations in *Callier v. Am.-Amicable Life Ins. Co. of Tex.,* No. EP-22-CV-00018-FM, are nearly identical to the facts alleged in Plaintiff's current Complaint.

93. On May 4, 2024, Plaintiff emailed Defendant a draft lawsuit detailing an additional twenty-five (25) unwanted telemarketing phone calls from Defendant utilizing spoofed caller identification and false, fake, or misleading names sent to Plaintiff from January 3, 2023, to February 17, 2023.

94. On June 25, 2024, Plaintiff settled the claims from paragraph 78 without filing a lawsuit

**FACTUAL ALLEGATIONS**

95. Defendant offers senior life insurance via telemarketing through prerecorded messages.

96. On June 25, 2024, Plaintiff settled the claims from paragraph 73 without filing a lawsuit.

97. From February 25, 2026, to April 3, 2026, Plaintiff received at least thirty-six (36) prerecorded phone calls to his business cell phone ending in 1804.

98. From March 27, 2026, to April 6, 2026, Plaintiff received at least seventeen (17) prerecorded phone calls to his business cell phone ending in 1830.

99. Each of the phone calls in this case was a solicitation phone call selling life insurance.

[3] *See e.g., Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 277 (Tex. 2012).

100. Each of the phone calls in this case utilized a spoofed caller identification number with a 915-area code.

101. Each of the phone calls in this case contained the same prerecorded non-human robotic-sounding voice message that stated:

> "Hello. Good Morning. My name is Sophie. Your zip code in the state of Texas qualifies for a senior final expense program. It guarantees your family receives up to $25,000 tax free within days and you're never stuck with funeral costs and unpaid bills. Your age is the main factor. So how old are you? That's great to hear that you're already taking steps to address this. However, with the rising cost of end of life expenses, we can offer you some of the best plans available at very low premiums. Would you like to compare your current plan with the new options we have?

102. Plaintiff did not give Defendant consent to send any of these prerecorded messages.

103. Table A displays each of the phone calls received by Plaintiff from Defendant.

**TABLE A**

| **Number** | **Date** | **Time** | **Caller ID** | **Notes** |
|---|---|---|---|---|
| **1.** | 02/25/2026 | 11:07 AM | 915-741-3274 | Prerecorded Sophie |
| **2.** | 03/03/2026 | 12:34 PM | 915-248-2654 | Prerecorded Sophie |
| **3.** | 03/03/2026 | 1:21 PM | 915-223-2743 | Prerecorded Sophie |
| **4.** | 03/04/2026 | 8:23 AM | 915-765-5642 | Prerecorded Sophie |
| **5.** | 03/04/2026 | 10:09 AM | 915-248-0863 | Prerecorded Sophie. Got contract |
| **6.** | 03/05/2026 | 1:05 PM | 915-659-6357 | Prerecorded Sophie |
| **7.** | 03/09/2026 | 1:16 PM | 915-875-8518 | Prerecorded Sophie |
| **8.** | 03/10/2026 | 8:27 AM | 505-387-8020 | Prerecorded Sophie |

| | | | | |
|---|---|---|---|---|
| **9.** | 03/11/2026 | 3:44 PM | 541-288-9645 | Prerecorded Sophie |
| **10.** | 03/13/2026 | 1:31 PM | 915-777-3740 | Prerecorded Sophie |
| **11.** | 03/13/2026 | 1:47 PM | 915-308-5072 | Prerecorded Sophie |
| **12.** | 03/17/2026 | 12:35 PM | 912-712-9169 | Prerecorded Sophie |
| **13.** | 03/17/2026 | 1:01 PM | 409-399-9790 | Prerecorded Sophie |
| **14.** | 03/17/2026 | 1:39 PM | 582-257-6938 | Prerecorded Sophie |
| **15.** | 03/17/2026 | 3:25 PM | 915-315-2678 | Prerecorded Sophie |
| **16.** | 03/18/2026 | 10:39 AM | 609-355-8113 | Prerecorded Sophie |
| **17.** | 03/24/2026 | 9:02 AM | 774-220-3728 | Prerecorded Sophie |
| **18.** | 03/24/2026 | 12:11 PM | 681-880-1884 | Prerecorded Sophie |
| **19.** | 03/242026 | 2:35 PM | 740-864-0544 | Prerecorded Sophie |
| **20.** | 03/24/2026 | 3:00 PM | 863-874-1678 | Prerecorded Sophie |
| **21.** | 03/25/2026 | 9:05 AM | 564-546-8093 | Prerecorded Sophie |
| **22.** | 03/25/2026 | 12:19 PM | 985-837-0898 | Prerecorded Sophie |
| **23.** | 03/25/2026 | 1:04 PM | 915-233-9137 | Prerecorded Sophie |
| **24.** | 03/25/2026 | 1:50 PM | 915-881-1214 | Prerecorded Sophie |
| **25.** | 03/25/2026 | 2:59 PM | 915-349-3169 | Prerecorded Sophie |
| **26.** | 03/25/2026 | 3:00 PM | 586-800-7530 | 915-433-1845 |
| **27.** | 03/25/2026 | 4:28 PM | 915-257-1379 | Prerecorded Sophie |

| | | | | |
|---|---|---|---|---|
| **28.** | 03/25/2026 | 11:42 AM | 915-757-0600 | 915-433-1845 |
| **29.** | 03/27/2026 | 1:58 PM | 915-265-1524 | Prerecorded Sophie 915-216-0794 |
| **30.** | 03/28/2026 | 1:42 PM | 915-318-9493 | Prerecorded Sophie |
| **31.** | 03/30/2026 | 12:58 PM | 915-899-6952 | Prerecorded Sophie 915-216-0794 |
| **32.** | 03/30/2026 | 1:33 PM | 419-454-8637 | Prerecorded Sophie |
| **33.** | 03/30/2026 | 4:07 PM | 740-864-0422 | Prerecorded Sophie |
| **34.** | 03/30/2026 | 4:08 PM | 430-440-7520 | Prerecorded Sophie |
| **35.** | 03/31/2026 | 9:35 AM | 915-256-8546 | Prerecorded Sophie |
| **36.** | 03/31/2026 | 9:44 AM | 915-742-1603 | Prerecorded Sophie – 915-216-0794 |
| **37.** | 3/31/2026 | 10:12 AM | 915-302-4049 | Prerecorded Sophie – 915-216-0794 |
| **38.** | 03/31/2026 | 10:17 AM | 317-765-5744 | Prerecorded Sophie |
| **39.** | 03/31/2026 | 12:17 PM | 915-348-1731 | Prerecorded Sophie – 915-216-0794 |
| **40.** | 03/31/2026 | 12:28 PM | 915-603-5072 | Prerecorded Sophie – 915-216-0794 |
| **41.** | 03/31/2026 | 12:56 PM | 915-234-1437 | Prerecorded Sophie – 915-216-0794 |
| **42.** | 04/01/2026 | 1:13 PM | 915-800-2689 | Prerecorded Sophie – 915-216-0794 |
| **43.** | 04/01/2026 | 1:16 PM | 915-955-8462 | Prerecorded Sophie – 915-216-0794 |
| **44.** | 04/01/2026 | 3:06 PM | 915-288-3297 | Prerecorded Sophie – 915-216-0794 |
| **45.** | 04/01/2026 | 3:19 PM | 915-223-6027 | Prerecorded Sophie – 915-216-0794 |
| **46.** | 04/02/2026 | 10:24 AM | 915-899-4389 | Prerecorded Sophie |

| | | | | |
|---|---|---|---|---|
| **47.** | 04/02/2026 | 2:59 PM | 915-313-4115 | Prerecorded Sophie |
| **48.** | 04/02/2026 | 4:10 PM | 915-751-4735 | Prerecorded Sophie |
| **49.** | 04/03/2026 | 12:35 PM | 915-875-8407 | Prerecorded Sophie |
| **50.** | 04/06/2026 | 7:17 AM | 915-266-5287 | Prerecorded Sophie – 915-216-0794 |
| **51.** | 04/06/2026 | 8:48 AM | 915-272-1867 | Prerecorded Sophie – 915-216-0794 |
| **52.** | 04/06/2026 | 9:05 AM | 915-306-4618 | Prerecorded Sophie – 915-216-0794 |
| **53.** | 04/06/2026 | 10:22 AM | 915-266-2017 | Prerecorded Sophie – 915-216-0794 |
| **54.** | 04/06/2026 | 11:00 AM | 915-493-6573 | Prerecorded Sophie – 915-216-0794 |
| **55.** | 04/06/2026 | 12:52 PM | 915-703-4329 | Prerecorded Sophie – 915-216-0794 |
| **56.** | 04/06/2026 | 1:41 PM | 915-440-0435 | Prerecorded Sophie – 915-216-0794 |
| **57.** | 04/06/2026 | 2:56 PM | 915-843-4943 | Prerecorded Sophie – 915-216-0794 |
| **58.** | 04/06/2026 | 3:04 PM | 915-335-7504 | Prerecorded Sophie – 915-216-0794 |
| **59.** | 04/06/2026 | 3:15 PM | 915-318-8464 | Prerecorded Sophie – 915-216-0794 |
| **60.** | 04/09/2026 | 9:06 AM | 915-596-5684 | Prerecorded Sophie |
| **61.** | 04/09/2026 | 9:34 AM | 915-757-3512 | Prerecorded Sophie |

104. On February 25, 2026, at 11:07 AM, Plaintiff received a phone call that displayed 915-741-3274 on Plaintiff's caller identification. Plaintiff answered the phone call, and the same prerecorded message in paragraph 86 began to play. Plaintiff attempted to purchase a life insurance policy as part of an investigation into the origin of the call, but the telemarketer hung up.

105. Through information and belief, the telemarketer disconnected the previous call because Plaintiff is in ongoing litigation with Defendant.

106. Plaintiff received two (2) additional phone calls on March 3, 2026, and another on March 4, 2026, at 8:23 AM, with the same exact prerecorded message as in paragraph 86.

107. On March 4, 2026, at 10:09 AM, Plaintiff received a phone call that displayed 915-248-0863 on Plaintiff's caller identification. Plaintiff answered the phone call, and the same exact voice message as in paragraph 86 began to play.

108. Plaintiff was on the phone with his cousin, Adean Hill Jr. ("Hill"), when the phone call came in. Plaintiff asked Hill to assist him in uncovering the origin of the phone call by obtaining a quote.

109. Hill agreed, and Plaintiff combined the calls by merging the calls into a three-way call.

110. Plaintiff enlisted Hill's assistance because Plaintiff's previous attempt to investigate the origin of the calls was short-circuited by the telemarketer hanging up the phone.

111. The telemarketer began the solicitation by stating, "Thank you so much for calling. My name is 'Joe'. I'm with 'Top Insurance Deals' on the recorded line. This call is about a new low-cost final expense life insurance plan recently approved in your area."

112. On June 10, 2026, Plaintiff searched Lexus Nexus and Open Corporates for an entity called "Top Insurance Deals" and did not find any such entity. Through information and belief Top Insurance Deals is a fictitious name designed to disguise the true identity of the company that placed the phone call.

113. The telemarketer, "Joe" asked Hill questions about his age, income, beneficiary, health, and other qualifying questions before transferring hill to Shashkov to complete the insurance application.

114. The questions asked by "Joe" were the same exact questions, in the same exact order, as asked by the telemarketer on the February 25, 2026, phone call. Upon information and belief, the telemarketer was reading from a marketing script provided by and approved by Defendant.

115. The telemarketer transmitted Hill's information to Shashkov via a shared database so that Shashkov already had Hill's information upon the transfer.

116. Shashkov asked Hill the same set of the same health-related questions as part of the confirmation process. Shashkov then took Hill's personal information, bank account information, and completed the solicitation to sell Hill a life insurance policy with Defendant.

117. On March 4, 2026, at 10:34 AM, Defendant sent a text message to Plaintiff's cell phone that contained a code to allow Shashkov to submit the insurance policy application. The text came from phone number 254-294-2530.

118. On March 4, 2026, at 10:34 AM, Defendant sent another text message to Plaintiff's cell phone that contained a link to download the insurance policy application from Defendant. The text came from phone number 254-294-2530.

119. The text in paragraph 103 stated, "Please review and sign your application for insurance by using the following link: https://r.aatx.com/ma/XRkvqHxb".

120. On March 4, 2026, Defendant sent Hill an email requesting his signature on the insurance application. The email came from noreply@aatx.com.

121. AATX.com is a domain owned and operated by Defendant.

122. On March 4, 2026, Hill downloaded the insurance policy application from Defendant. The insurance policy listed Shashkov as the insurance agent and Defendant as the insurance company offering the life insurance coverage.

123. The insurance application contains a tracking and/or processing code, M3273089.

124. The insurance application lists Plaintiff's phone number, 915-334-1830, on the application.

125. Plaintiff continued to receive the same prerecorded message as detailed in Table A.

126. Plaintiff called each of the phone numbers in Table A. None of the numbers is a working number that is connected to Defendant.

127. Defendant intentionally spoofed the caller identification in order to make the call appear as a local call and increase the chances of Plaintiff answering the calls.

128. The insurance application did not contain a provision allowing Defendant to send Plaintiff prerecorded messages.

129. On March 23, 2026, Plaintiff emailed Defendant's attorney alerting him of the unauthorized phone calls.

130. From March 24, 2026, to March 30, 2026, Plaintiff received an additional sixteen (16) "Sophie" prerecorded message from Defendant.

131. On March 30, 2026, Plaintiff informed Defendant that he had, "received the same prerecorded 'Sophie' phone call an additional 16 times since I alerted you."

132. On March 31, 2026, Plaintiff again informed Defendant of the continued "Sophie" prerecorded phone calls.

133. Plaintiff received an additional fifty-two (52) "Sophie" phone calls after March 31, 2026.

134. None of the sixty-one (61) prerecorded phone calls properly stated the name of the company making the phone calls or the name of the seller.

135. All artificial or prerecorded voice telephone messages shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. 47 C.F.R. § 64.1200(b)(1).

136. A telephone solicitor may not make a consumer telephone call to a consumer unless the telephone solicitor, immediately upon making contact with the consumer to whom the call is made, identifies himself or herself by name and the business on whose behalf the telephone solicitor is called. Texas Business and Commerce Code § 301.051(b)(1)(A-B).

137. Defendant made at least four (4) solicitation phone calls to Plaintiff before 8 AM local time.

138. Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

139. On March 23, 2026, Plaintiff emailed Defendant and alerted them of the spoofed caller identification numbers used by Defendant.

140. No emergency necessitated the calls

141. Either Defendant or Shashkov hired the unnamed telemarketer to place solicitation phone calls on behalf of Defendant Amicable.

142. At this point in the proceedings Plaintiff has not had the benefit of Discovery and is not in position to make a definitive statement about who hired the telemarketer. Plaintiff, therefore, offers two theories of liability; each based on who hired the telemarketer.

**TIMOTHY SHASHKOV WAS DEFENDANT'S AUTHORIZED AGENT**

143. American Amicable appointed Shashkov to sell insurance on their behalf on November 24, 2025.[4]

[4] https://txapps.texas.gov/NASApp/tdi/TdiARManager

Texas Department of Insurance
**Insurance License Renewal**

## Appointments

**TIMOTHY SCOTT SHASHKOV**

| Company | Active |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY | 02/13/2026 |
| AMERICAN-AMICABLE LIFE INSURANCE COMPANY OF TEXAS | 11/24/2025 |

144. Shashkov is still a current appointed, authorized, agent of Amicable and has not been relieved of his duties or appointment.

145. At all times relevant to this Complaint, Shashkov was the agent of Defendant.

146. Regardless of whether the act is done at the request of or by the employment of an insurer, broker, or other person, a person is the agent of the insurer for which the act is done or risk is taken for the purposes of the liabilities, duties, requirements, and penalties provided by this title or Chapter 21 if the person, (1) solicits insurance on behalf of the insurer; (2) receives or transmits other than the on person's own behalf an application for insurance of an insurance policy to or from the insurer; (3) advertises or otherwise gives notice that the person will receive or transmit an application for insurance or an insurance policy. Tex. Insurance Code § 4001.051(b)(1-3).

147. A person who solicits an application for life, accident, or health insurance or property or casualty insurance is considered the agent of the insurer issuing a policy on the application and not the agent of the insured. Tex. Insurance Code § 4001.052.

148. "In the contexts of life, health, and accident insurance, the Texas Insurance Code makes no distinction between recording agents and soliciting agents. *See May v. United Serv. Ass'n. of America*, 844 S.W.2d 666, 669 n. 8 (Tex. 1992) (discussing TEX. INS. CODE art. 21. 14. § 20).

Rather, agents are defined generally; section 21.02 of the Code lists various acts performed in the ordinary course of providing insurance, [5] and states that any person who performs these acts 'shall be held to be the agent of the company for which the act is done, or the risk is taken, as for as relates to all liabilities, duties, requirements and penalties set forth in in this chapter. *Celtic Life Ins. Co. v. Coats*, *885 S.W. 2d 96**, 1994 Tex. LEXIS 119 **3, 37 Tex. Sup. J. 1083.

149. An insurance company is generally liable for any misconduct by an agent that is within the actual or apparent score of the agent's authority. *See, e.g. Royal Globe Ins. Co. v. Bar Consultants, 577 S.W.2d 688, 693-94 (Tex. 1979); Grand Lodge Free and Accepted Masons v. Walker, 110 S.W.2d 945. 949* (Tex. Civ. App. –Dallas 1937, no writ); see generally George J. Couch et al., COUCH ON INSURANCE 2D § 26A:265, at 506 (rev. ed. [*99] 1984). This rule is based on notions of farness" "since the principal has selected the agent to actin a venture in which the principal is interested, it is fair, as between him and a third person, to impose upon him the risk that the agent may exceed his instructions." *Royal Globe, 577 S.W.2d at 694* (quoting *Standard Distributors v. FTC, 211 F.2d 7, 15 (2d Cir. 1954)* (Hand, J.)). *Celtic Life Ins. Co. v. Coats*, 885 S.W. 2d 96*, 1994 Tex. LEXIS 119 **6, 37 Tex. Sup. J. 1083.

150. "A principal is liable for its agent's acts when the agent has actual or apparent authority to commit those acts, or when the principal ratifies them. *See Spring Garden 79U, Inc. v. Stewart Title C*o., 874 S.W.2d 945, 948 (Tex.App. Houston [1 Dist.] 1994, no writ). In determining the principal's vicarious liability, the proper question is not whether the principal authorized the specific wrongful act, but whether the agent was acting within the scope of the agency at the time

[5] The acts listed include, among other things, soliciting insurance on behalf of an insurance company; transmitting an application or policy to or from the insurance company; receiving, collecting, or transmitting an insurance premium, and adjusting a loss on behalf of an insurance company.

of committing the act. *See Celtic Life Ins. Co. v. Coats*. 885 S.W.2d 96, 99 (Tex. 1994) (emphasis added). This is a question of fact unless the agent's authority (or lack thereof) is clearly established. *See Geders v. Aircraft Engine and Accessory Co.*, 599 S.W.2d 646, 650 (Tex.Civ. App. Dallas 1980). *See Schrum v. Land*, 12 F.Supp.2d 576, 582 (S.D. Tex. 1997).

151. Defendant empowered Shashkov with broad legal authority to act on behalf of American Amicable, speak on behalf of American Amicable, make representations on behalf of American Amicable, and to bind American Amicable to insurance agreements and contracts.

152. It is the purpose of these sections to further define and state the standards that are necessary to prohibit deceptive acts or deceptive practices by insurers and insurance agents and other persons in their conduct of the business of insurance or in connection therewith, whether done directly or indirectly, and irrespective of whether the person is acting as insurer, principal, agent, employer, or employee, or in other capacity or connection with such insurer. Tex. Administrative Code Title 28. Insurance § 21.1. Deceptive Acts or Practices of Insurers, Agents, Connected Persons.

153. A violation of Texas Business and Commerce Code Chapter 305 is a Deceptive Trade Practices Act violation. Tex. Bus. Com. Code § 305.054.

154. Shashkov was acting on the express authority of Defendant, and within the actual scope of his authority when he solicited Plaintiff for life insurance.

155. Shashkov was acting on the express authority of Defendant, and within the actual scope of his authority when he signed the insurance application at issue in this Complaint on behalf of Defendant.

156. The Supreme Court of Texas affirmed that the knowledge and acts of an insurance agent within the scope of their employment are legally imputed to the insurance carrier stating, "The

purpose of the statute was to vest local recording agents with authority co-extensive with that of the company insofar as writing insurance is concerned and remove all questions of the local agent's actual or apparent authority from the field of cavil or dispute…." *Shaller v. Commercial Standard Insurance Co*., 158 Tex. 143, 309 S.W.2d 59 (1958).

**VICARIOUS LIABILITY OF DEFENDANT IF TIMOTHY SHASHKOV HIRED THE TELEMARKETER**

157. Shashkov was appointed as an agent of Defendant and authorized to market insurance products, including by telephone, on behalf of Defendant.

158. Defendant empowered Shashkov with broad authority to decide the manner in which Shashkov would markets Defendant's products, and Shashkov was acting within the scope of his authority when it hired the John Doe telemarketer to solicit Plaintiff.

159. Defendant had the right to control the manner in which Shashkov conducted those telephone solicitations.

160. Shashkov hired and authorized John Doe to act as a subagent of Defendant. Shashkov authorized Doe to make prerecorded phone calls on Defendant's behalf.

161. Shashkov provided John Doe with the qualifying questions and instructed John Doe to ask those qualifying questions of each person solicited by John Doe on behalf of Shashkov.

162. Shashkov exercised control over the John Doe telemarketer by providing age, income, health, state of residence requirements, and other restrictions as the qualifying attributes for the insurance policies.

163. Shashkov authorized the telemarketer to market life insurance by utilizing prerecorded messages as part of the marketing campaign.

164. Shashkov approved the script for the prerecorded messages used by the telemarketer.

165. Shashkov and the telemarketer utilized a shared telephone system that allowed the telemarketer to seamlessly transfer calls to Shashkov.

166. Shashkov and the telemarketer shared an integrated customer database that allowed the telemarketer to instantly transfer customer information to Shashkov.

167. The telemarketer was the authorized agent of Shashkov and the subagent of Defendant.

168. Defendant appointed Shashkov to market and sell insurance on its behalf.

169. Defendant maintained interim control over Shashkov, including when, and under what circumstances, it would accept applications and approve insurance policies submitted by Shashkov.

170. Shashkov had both actual and apparent authority to act on behalf of Defendant.

171. "A principal is liable for its agent's acts when the agent has actual or apparent authority to commit those acts or when the principal ratifies them." *See Schrum v. Land*, 12 F.Supp.2d 576, 582 (S.D. Tex. 1997).

172. Under Texas law, a principal-agency relationship exists when an individual has actual or apparent authority to act on behalf of another or the latter ratifies the actions of the former. *Debaillon v. Total Minatome Corp.*, 166 F.3d 339, 1998 WL 912094, *2 (5th Cir. 1998).

**VICARIOUS LIABILITY OF DEFENDANT IF AMERICAN AMICABLE HIRED THE TELEMARKETER**

173. Defendant Amicable has made a conscious effort to violate the TCPA and associated Texas State consumer protection laws in search of undue profits.

174. Defendant has been on notice for years about the illegal telemarketing calls being made on its own behalf and yet, it still hires anonymous telemarketers to make solicitation phone calls.

175. Defendant hired the John Doe telemarketer in this Complaint and authorized John Doe to make solicitation phone calls on behalf of Defendant.

176. Defendant instructed John Doe on which states to call.

177. Defendant instructed John Doe about the frequency and volume of calls to be made so that its insurance agents would not be overwhelmed by the call transfers.

178. Defendant dictated how often to disseminate the prerecorded messages in order to volume of calls, and transfers, so as to not overwhelm its insurance agents.

179. Defendant participated in, and approved, the drafting and recording of the prerecorded message at issue in this Complaint.

180. Defendant instructed the John Doe telemarketer to use false, misleading, and incorrect names during the phone calls in order to suppress the knowledge of the phone call origins.

181. Defendant has a policy of not revealing the source of phone calls as part of their "plausible deniability" scheme to avoid liability.

182. Defendant controlled the timing and frequency of the predictively dialed calls, in order to ensure that it had operators sufficient to handle the leads that came into the system.

183. Defendant maintained interim control over when, and under what circumstances, it would accept transfers and leads from John Doe.

184. Defendant maintained and controlled a database shared with John Doe that allowed John Doe to seamlessly transfer calls and leads to Defendant's agents without an interruption of the calls.

## VICARIOUS LIABLITY OF DEFENDANT THROUGH RATIFICATION

185. A party "may ratify an act by failing to object to or to repudiate it," or by "receiving or retaining [the] benefits it generates." However, a party "is not bound by a ratification made

without knowledge of material facts involved in the original act when the [party] was unaware of such lack of knowledge." *Hodgin*, 885 F.3d at 252 (citing various sections of the Restatement (Third) of Agency (2006)).

186. Defendant ratified the actions of Agent Shashkov when it both retained Shashkov as an agent and when it encouraged Shashkov's illegal behavior be failing to take action to implement policies and procedures to punish agents for TCPA violations and to implement policies and procedures to stop the violations from happening.

187. Defendant has been the subject of at least seventeen (17) federal lawsuits in which it was accused of violating the Telephone Consumer Protection Act via prerecorded solicitation phone calls, use of spoofed phone numbers, and delivering false, misleading, and inaccurate names during its telemarketing.

188. Defendant has been on notice for years that telemarketing phone calls utilizing prerecorded messages have been used to market their insurance products.

189. After years of the exact same allegations contained in this Amended Complaint, Defendant reasonably should have known or consciously avoided knowing that the actual callers and telemarketers were violating the law, and Defendant has failed to take effective action within their power to require compliance.

190. Defendant gave substantial assistance or support to their agents and Defendant's telemarketers while knowing, consciously avoiding knowing, or being recklessly indifferent to the fact that their insurance agents and telemarketers were engaged in acts or practices that violated the TCPA and TBCC.

191. Defendant ratified the unlawful calls to Plaintiff described above because they accepted and intended the benefits to themselves of the telemarketing while knowing or consciously avoiding knowing the calling was unlawful.

192. Defendant is acutely aware of the phone calls being made to solicit their insurance products, and Defendant is acutely aware that those phone calls are being made utilizing prerecorded messages.

193. Defendant accepts the benefits of the insurance agents that break the law, continue to employ those insurance agents, and refuses to implement policies and procedures that would stop their agents from violating the law.

194. On March 4, 2026, Shashkov submitted an application for insurance life insurance with Defendant.

195. Defendant processed and approved the application with full knowledge that prerecorded telemarketing calls were made to solicit Plaintiff and other consumers utilizing prerecorded messages.

196. Defendant knew, or reasonably should have known, after years of BBB complaints, TCPA lawsuits, and numerous settlements, that prerecorded phone calls were used to market its insurance policies.

197. Defendant turned a willful blind eye to the violations in search of increased profits and earnings per share.

**INJURY, HARM, AND DAMAGES AS A RESULT OF THE CALLS**

198. Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy.

199. Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

200. Defendant's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

201. Plaintiff has been harmed, injured, and damaged by the calls, including, but not limited to: reduced device storage space, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of my cell phone.

202. Plaintiff incurred increased electric bills as a result of more frequent charging of his cell phone related to the unauthorized phone calls.

## COUNT ONE:

## Non-Emergency Prerecorded Call to Cellular Telephones, 47 U.S.C. 227(b)(1)(A)(iii)

203. Plaintiff realleges and incorporates by reference every allegation set forth in paragraphs 1-202.

204. The foregoing acts and omissions of Defendant and/or their affiliates or agent constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by making non-emergency telemarketing ATDS texts to Plaintiff's cellular telephone numbers without his prior express written consent.

205. Plaintiff was statutorily damaged at least sixty-one (61) times under 47 U.S.C § 227(b)(3)(B) by Defendant by the telephone calls described above, in the amount of $500.00 per call.

206. Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damages amount as permitted under U.S.C. § 227(b)(3)(C) for this willful or knowing violation.

## COUNT TWO:

## Violations of Texas Business and Commerce Code § 301.051(b)(1)(A-C)
## Failure to Identify

207. Plaintiff realleges and incorporates by reference every allegation set forth in paragraphs 1-206.

208. Defendant did not immediately after making contact with the consumer to whom the call is made, identify himself or herself by name, the business on whose behalf the telephone solicitor is calling, and the purpose of the call. TBCC § 301.051(b)(A-C).

209. Plaintiff was damaged at least sixty-one (61) times by Defendant.

210. A consumer injured by the chapter may bring an action for recovery of damages. The damages may not be less than the amount the consumer paid the person who sold the consumer good or services through the use of the telephone solicitor. Tex. Bus. Com. Code § 301.104.

211. Defendant seeks damages in the amount of 1,000 per violating phone call.

**COUNT THREE**
**Violations of Texas Business and Commerce Code § 305.053**
**Prerecorded Phone Calls in violation of 47 U.S.C. 227(b)**

212. Plaintiff realleges and incorporates by reference every allegation set forth in paragraphs 1-211.

213. Defendant placed at least sixty-one (61) prerecorded phone calls to Plaintiff in violation of 47 U.S.C. § 227(b).

214. A person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A may bring an action in theist ate against the person who originates that communication. Tex. Bus. Com. Code § 305.053.

215. Plaintiff was statutorily damaged at least sixty-one (61) times under 47 U.S.C § 227(b)(3)(B) by Defendant by the telephone calls described above, in the amount of $500.00 per call. Tex. Bus. Com. Code § 305.053(b)(1).

216. If the court finds that the defendant committed the violation knowingly or intentionally, the court may increase the amount of the award of damages under Subsection (b) to not more than the greater of $1,500 for each violation. Tex. Bus. Com. Code § 305.053(c)(1).

217. The fact that a claimant has recovered under a private action arising from a violation of this chapter more than once may not limit recovery in a future legal proceeding in any manner. Tex. Bus. Com. Code § 305.055.

**COUNT FOUR**
**Violations of Texas Business and Commerce Code § 301.051(b)(2)**
**Telemarketing Calls before 9 AM Local Time**

218. Plaintiff realleges and incorporates by reference every allegation set forth in paragraphs 1-217.

219. A telephone solicitor may not make a consumer telephone call to a consumer unless the telephone solicitor makes the call after 12 noon or before 9 p.m. on a Sunday or after 9 a.m. and before 9 p.m. on a weekday or a Saturday. TBCC § 301.051(b)(2).

220. Defendant called Plaintiff before 9 a.m. on at least four (4) occasions.

221. Plaintiff was damaged at least four (4) times by Defendant.

222. A consumer injured by the chapter may bring an action for recovery of damages. The damages may not be less than the amount the consumer paid the person who sold the consumer good or services through the use of the telephone solicitor. Tex. Bus. Com. Code § 301.104.

223. Plaintiff seeks damages in the amount of 1,000 per violating phone call.

**COUNT FIVE**
**Violations of the Texas Business and Commerce Code § 17.46**
**Transmitting False Caller Identification**

224. Plaintiff realleges and incorporates by reference every allegation set forth in paragraphs 1-223.

225. Defendant intentionally transmitted false caller identification sixty-one (61) times while making telephone solicitation phone calls in violation of Chapter 304 of the Texas Business and Commerce Code.

226. A violation of Chapter 304 of the Texas Business and Commerce Code is a Deceptive Trade Practices Act violation under Subchapter E, Chapter 17. Tex. Bus. Com. Code § 304.2581(a).

227. Plaintiff suffered mental anguish damages from Defendant's deliberate use of Deceptive Trade Practices in it marketing.

228. Plaintiff seeks damages for mental anguish in the amount of $500 for each of sixty-one (61) violations of Tex. Bus. Com. Code § 17.46.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against Defendant as follows:

A. Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B. A declaration that actions complained of herein by Defendant violate the TCPA and Texas state law;

C. An award of $1,500 per call in statutory damages arising from the TCPA 47 U.S.C. 227(b) intentional violations for sixty-one (61) calls;

D. An award of $5,000 per phone call in statutory damages arising from intentional violations of the Texas Business and Commerce Code 301.051(b)(1)(A-C) for sixty-one (61) phone calls.

E. An award of $1,500 per call in statutory damages arising from TBCC 305.053 intentional violations for sixty-one (61) calls;

F. An award of $5,000 per phone call in statutory damages arising from intentional violations of the Texas Business and Commerce Code 301.051(b)(2) for four (4) phone calls;

G. An award of $500 per phone call in statutory arising from Deceptive Trade violations pursuant to intentional caller identification number spoofing. Texas Business and Commerce Code § 17.46.

H. An award to Plaintiff of damages, as allowed by law under the TCPA;

I. An award to Plaintiff of damages, as allowed by law under the TBCC;

J. An award to Plaintiff of interest, costs, and attorneys' fees, as allowed by law and equity.

K. Such further relief as the Court deems necessary, just, and proper.

Dated: June 16, 2026,

Respectfully submitted,

/s/ Brandon Callier

Brandon Callier
Plaintiff, Pro Se
1490 A George Dieter Drive
#174
El Paso, TX 79936
915-383-4604
Callier74@gmail.com